# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JAMES VANDERHEYDEN,

        Plaintiff,

vs.                                            No.  CV 98-264 SC/LFG

INTEL CORPORATION,

        Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the following motions:  (1) Defendant's Motion For Summary Judgment, filed December 11, 1998 (Doc. No. 27); (2) Defendant's First Motion in Limine, filed December 11, 1998 (Doc. No. 31); and (3) Defendant's Motion To Partially Strike the Affidavit of James VanderHeyden, filed January 15, 1999 (Doc. No. 37).  Plaintiff has not filed a response opposing the motion in limine or the motion to strike, and those motions will be GRANTED.  For the reasons contained in this opinion, the motion for summary judgment will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff brings claims for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and under the New Mexico Human Rights Act ("NMHRA"), N.M. Stat. Ann. 1978 § 28-1-1, *et seq.* (Repl.

Pam. 1996), and for gender discrimination and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* He also brings claims for breach of contract and retaliatory discharge under New Mexico common law. This case was originally filed in state court and removed to federal court on the grounds of both federal question and diversity. Federal jurisdiction is not contested and is hereby determined to be present pursuant to 28 U.S.C. §§ 1331 and 1332.

Plaintiff James VanderHeyden was employed by Defendant Intel Corporation in Rio Rancho, New Mexico for about two and one-half years, from September 2, 1994 until his discharge on April 2, 1997. In Counts I and II he claims that Intel discharged him because of his disabilities, depression and sleep apnea. In Count III he alleges that he was subjected to gender discrimination, but he now abandons that claim. He contends that he opposed Intel's practices in the areas of gender and disability discrimination, and claims in Count IV that his discharge was in retaliation for this protected activity. In Count V he claims that Intel breached an implied contract of employment by terminating him without just cause. In Count VI for retaliatory discharge, he claims that he was discharged, in part, for performing his legal duty to serve as a juror in the Bernalillo County Metropolitan Court.

Defendant Intel denies Plaintiff's contentions and asserts that it terminated him for misrepresenting that he was not at work because he was serving on jury duty. Additionally, after his termination, Intel learned that he committed another offense, i.e., secretly tape recording both his immediate supervisor and a human resources

2

representative without their consent, which, had Intel known about it, would have

resulted in summary termination.  Intel contends that this after-acquired evidence is a

complete bar to the breach of contract claim, and that it precludes the award of any

damages occurring after the date of the secret tape recording on the remaining claims.

Intel also contends that VanderHeyden was not covered by the ADA or the NMHRA, that

he was at all times an at-will employee with no contract of employment, and that he was

neither retaliated against for any protected activity nor wrongfully discharged.

## SUMMARY JUDGMENT STANDARDS

A motion for summary judgment should be granted only when there is no genuine

issue of material fact, and, as a matter of law, the moving party is entitled to judgment.

Fed. R. Civ. P. 56(c).  A court's job in ruling on a motion for summary judgment is not to

weigh the evidence, make credibility determinations, or draw inferences from the facts,

but, rather, to determine whether there is a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249, 255 (1986). The inquiry a court must make is "whether

the evidence presents a sufficient disagreement to require submission to a [fact finder] or

whether it is so one-sided that one party must prevail as a matter of law."  Id.  at 251-52.

If a court finds that there are disputed material factual issues, these issues should be

resolved by the fact finder, and summary judgment is precluded.  Id. at 248.

When ruling on a motion for summary judgment, a court must construe the facts in

the light most favorable to the nonmovant.  Magnum Foods, Inc. v. Continental Casualty

Co., 36 F.3d 1491, 1497 (10th Cir. 1994).  All doubts must be resolved in favor of the

existence of triable issues. <u>World of Sleep, Inc. v. La-Z-Boy Chair Co.</u>, 756 F.2d 1467, 1474 (10th Cir. 1985). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Only then does the burden shift to the nonmovant to come forward with evidence showing that there is a genuine issue of material fact. <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).

## FACTUAL SUMMARY

VanderHeyden's employment with Intel began in September 1994 in the Employee Benefits Service Department. He was assigned to work on a special "GENI" project for most of 1996 that required frequent travel to California. During that year, problems developed in Plaintiff's marriage, and he experienced and was treated for numerous medical symptoms, including depression and sleeping problems. Later that year, after the GENI project ended and Plaintiff returned to the employee benefits department in a supervisory capacity, he began divorce proceedings. At the same time, his stress increased because of several factors at work. In December 1996 and January 1997, when his divorce required more of his time and attention, his medical/psychological condition worsened into a severe depression, and he had difficulty keeping up with work. His attendance at work suffered, as did the quality of his performance.

In the week beginning January 13, 1997, Plaintiff began jury duty. Although he only served on jury duty two mornings, he was absent from work most of the week and

the quality of his work was unsatisfactory. Some of the workers expressed concern about being unsupervised. His supervisor, Jamie Robillard, became so concerned about his attendance and his performance over the past few weeks that she prepared a corrective action plan ("CAP") detailing VanderHeyden's many failings and presented it to him the following Monday, January 20, 1997. A CAP gives an employee notice of work problems and an opportunity to correct them; failure to correct may result in immediate termination. After receiving the CAP Plaintiff discussed his personal and medical problems with Robillard, who suggested he request a medical leave of absence. Intel approved the leave beginning January 21.

After he received the CAP, Plaintiff complained to two people in Intel's Human Resources Department about unfair treatment by his supervisor. These complaints included allegations of gender and disability discrimination.

Plaintiff's medical leave, which at first was expected to last only a few weeks, continued until March 31. He was treated for severe depression during that time, and he had surgery to treat his sleep apnea in late March. When he returned to work on March 31 with a full medical release, Plaintiff's supervisor confronted him with allegations that he had misrepresented his jury duty in January. She demanded that he account for the discrepancies between his attendance at work and the paperwork Intel had received from the court. Plaintiff was unable to do so, and he was put on suspension. Two days later he was terminated. He filed this lawsuit in January 1998.

**DISCUSSION**

**Count I - Disability Discrimination under the ADA**

The ADA prohibits covered employers from discriminating against qualified individuals on the basis of their disabilities.  Sutton v. United Air Lines, Inc., ___ U. S. ___,  119 S. Ct. 2139, 2144 (1999); 42 U.S.C. § 12112(a).  Defendant contends that Plaintiff's ADA claim fails because as a matter of law he was not a qualified individual, first because he did not suffer from a disability as defined in the ADA, also because he did not perform the essential functions of his job, and finally because he never asked for a reasonable accommodation.

To establish a claim under the ADA, Plaintiff must demonstrate that:  (1) he has a disability as defined by the ADA; (2) he is a qualified individual as defined by the ADA; and (3) Intel discriminated against him in its termination decision because of his disability.  Sutton v. United Air Lines, Inc., 130 F.3d 893, 897 (10th Cir. 1997), *aff'd*, __ U.S. ___, 119 S. Ct. 2139 (1999).  The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  Sutton, 119 S. Ct. at 2144 (*quoting* 42 U.S.C. § 12102(2)).  VanderHeyden contends that he is disabled under all three subsections.

The undisputed evidence on the issue of Plaintiff's disability, viewed in the light most favorable to Plaintiff, is as follows.  Plaintiff's depression began in early 1996 when he was working on the GENI project that involved extensive travel, up to 25-30% of his

6

work week. Participating on this project caused strain in Plaintiff's marriage, and he sought medical help to deal with his problems.

Plaintiff's primary care physician, Dr. Miller, prescribed an anti-depressant medication for him and referred him for a psychiatric evaluation. His psychiatric diagnosis at that time, in March 1996, was "adjustment reaction with depressed mood and underlying compulsive behavior." Among his complaints were increased work stress with traveling, marital problems, early waking several times per week, low motivation level, anxiety, increase in depressed mood, increased nail biting, increased repetitive thoughts, ruminating over work and marital issues, concentration problems, and forgetfulness. He was referred to Dr. Langland for psychotherapy, but there are no records indicating he followed through on the referral.

In June 1996, Plaintiff informed his supervisor, Jamie Robillard, that the constant travel associated with GENI was exacerbating his depression, causing him fatigue, and interfering with his marriage. Although Robillard offered to move him off GENI and return him to the employee benefits department, Plaintiff declined, saying there was no sense in bailing out halfway with so many months invested.

Plaintiff experienced severe depression for at least a month between mid-December 1996 and mid-January 1997. This coincided with his divorce proceedings, his moving out of the marital home, and increased stress at work because of implementation of the new GENI program in his department, training of new employees, and year-end vacations.

On Monday, January 20 when Robillard delivered Plaintiff's CAP, he explained his attendance problems in the context of his divorce and severe depression. At Robillard's suggestion, he left work to obtain a medical leave of absence pursuant to Intel policy. Plaintiff took an approved medical leave of absence from January 21 through March 30, 1997.

During his medical leave, Plaintiff began seeing a psychiatrist, Dr. Arnet, who diagnosed Plaintiff with a "severe . . . recurrence of depression." He thought the depression had started in early 1996, partly improved, and then worsened, at least in part because of Plaintiff's going through a divorce. He believed that Plaintiff should have requested medical leave in December 1996 to deal with stress and anxiety caused by his impending divorce, but Plaintiff did not request any accommodation from Intel at that time. Dr. Arnet put Plaintiff on a second anti-depressant medication and had several therapy sessions with him. He extended Plaintiff's medical leave a couple times. Dr. Arnet believed that sleep apnea surgery could improve Plaintiff's depression and sleep problems, and Plaintiff had the surgery on March 17, 1997, while still on medical leave. Dr. Arnet released him to work without restrictions effective March 31, 1997. Plaintiff discontinued therapy with Dr. Arnet on May 21, 1997, and is not currently seeing any mental health professional.

**Actual Disability**

In assessing whether a person has a physical or mental impairment that substantially limits one or more life activities, the Court follows a three-step analysis:

(1) does the person have an impairment; (2) does the life activity upon which he relies constitute a major life activity; and (3) does the impairment substantially limit the major life activity? Bragdon v. Abbott, 524 U.S. 624, ___, 118 S. Ct. 2196, 2202 (1998). Plaintiff must identify his alleged impairments as well as the major life activities he believes are substantially limited by his impairments. Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1230 (10th Cir. 1999). Plaintiff identifies his impairments as depression and sleep apnea, and his major life activities as working, sleeping, and interacting with others.

Depression qualifies as an impairment under the ADA. Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir.), *amended on reh'g on other grounds*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied,* 520 U.S. 1274 (1997). Sleep apnea is also an ADA impairment. Silk v. City of Chicago, 1996 WL 312074 at *15 (N.D. Ill. 1996).

Working is considered a major life activity. 29 C.F.R. § 1630.2(i); Sutton, 130 F.3d at 900, *aff'd,* 119 S. Ct. at 2151 (Supreme Court assuming without deciding that working is a major life activity). Sleeping is also a major life activity. Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999), *petition for cert. filed,* 67 U.S.L.W. 3707 (May 5, 1999). I will assume that interacting with others is a major life activity, but there is simply no evidence in the record of an impairment in Plaintiff's ability to interact with others. The question, then, is whether there is sufficient evidence in the record of a substantial limitation on Plaintiff's sleeping or working.

As for a sleeping problem, the evidence does not support a finding of a substantial

limitation. Plaintiff experienced "early waking several times per week" in early 1996.
His sleep apnea was diagnosed as "mild" in October 1996, with no indication it
substantially interfered with his sleeping; rather it caused "heavy snoring ... it's reached a
real social issue in the marriage." *See* Aff. VanderHeyden, Attach. A. Additionally, the
evidence does not support a finding that his sleeping problem still exists. Dr. Arnet
expected that treatment for his depression and sleep apnea surgery in 1997 would correct
his sleeping problem. Plaintiff had surgery for his sleep apnea in March 1997, and he
was cleared to work without restrictions on March 30. Corrective measures must be
taken into account when determining whether an individual is disabled. Sutton, 119
S. Ct. at 2143, 2146-49. I conclude that Plaintiff cannot rely upon the major life activity
of sleeping to support his claim of ADA disability.

This leaves working as the only major life activity that must be analyzed. When
the major life activity is working, the plaintiff must show he is unable to work in a broad
class of jobs. Sutton, 119 S. Ct. at 2151. "'The inability to perform a single, particular
job does not constitute a substantial limitation in the major life activity of working.'" Id.
(*quoting* 29 C.F.R. § 1630.2(j)(3)(i)). A person's inability to report to a particular job is
insufficient to show a substantial limitation in the major life activity of working.
Bolton v. Scrivner, Inc., 36 F.3d 939, 943 (10th Cir. 1994), *cert. denied,* 513 U.S. 1152
(1995).

Factors that should be considered in determining whether an impairment
substantially limits a major life activity include the nature and severity of the impairment,

the duration or expected duration of the impairment, and the permanent or long term impact of the impairment. 29 C.F.R. § 1630.2(j)(2); Bolton, 36 F.3d at 943. Although Plaintiff has produced evidence that he was treated for depression as early as March 1996 and as late as May 1997, the evidence shows that Plaintiff's depression was severe only for a few months, and there is no evidence it is permanent. Impairments "of limited duration" with "no permanent or long term impact" on a person's ability to work, do not meet the ADA definition of disability. Bolton, 36 F.3d at 944 n.3; *see* Sanders v. Arneson Prods, Inc., 91 F.3d 1351, 1354 (9th Cir. 1996) (acute, temporary major depression is not ADA disability because not of sufficient duration), *cert. denied,* 520 U.S. 1116 (1997).

Further, after VanderHeyden was released to return to work, there is no evidence that either his depression or his sleep apnea limited him to any degree from working in any job. He has produced no evidence of his vocational training, or of the number and type of other jobs from which he would be disqualified. *See* 29 C.F.R. § 1630.2(j)(3)(ii) (listing additional factors when major life activity is working); Bolton, 36 F.3d at 943.

Plaintiff has failed to come forward with evidence that his depression and sleep apnea substantially limited him in his ability to work at a variety of jobs for more than a short period. I conclude he did not suffer from an actual ADA disability.

**Record of Disability**

An employee has a record of disability when the employer has records showing that he "has a history of, or has been misclassified as having, a mental or physical

impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k); *see* <u>Howell v. Sam's Club  #8160/Wal-Mart</u>, 959 F. Supp. 260, 267-68 (E.D. Pa. 1997) (employer's records must demonstrate substantial limitation in major life activities), *aff'd,* 141 F.3d 1153 (3d Cir. 1998).  Intel had records showing VanderHeyden's impairment, which consist of notes from Drs. Miller and Arnet requesting that he be excused from work for limited amounts of time, and a medical leave of absence form dated January 27, 1997, describing his diagnosis as major depression, severe.  Pl. Ex. J, K.  There is no mention of sleep apnea.  Nothing in these records shows that VanderHeyden has a history of depression that would disqualify him from a class of jobs or from a  broad range of jobs in various classes.  Rather, the records indicate that his depression is expected to be of limited duration and that his prognosis is excellent. The records, therefore, do not describe an impairment that substantially limits any of Plaintiff's major life activities.  Plaintiff has failed to prove a record of disability.

### Regarded as Disabled

An employer may run afoul of the ADA under the "regarded as" prong by mistakenly believing that an employee has a substantially limiting impairment that the employee does not have, or by mistakenly believing that an employee's impairment substantially limits one or more of his major life activities when in fact the impairment is not so limiting.  <u>Sutton</u>, 119 S. Ct. at 2149-50.  "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job."  <u>Murphy v. United Parcel Serv., Inc.</u>  ___ U.S. ___, 119 S. Ct. 2133, 2138

(1999). Thus, Plaintiff must come forward with evidence that Intel mistakenly believed that his nonlimiting impairments of depression and sleep apnea did substantially limit his ability to work in a broad range of jobs. *See* Colwell v. Suffolk County Police Dept., 158 F.3d 635, 647 (2d Cir. 1998) (police officers assigned to light duty not perceived as incapable of working in broad range of jobs).

The only evidence in the record is that VanderHeyden's supervisors and coworkers were aware that he was depressed, that Robillard suggested that he seek medical attention and medical leave, and that Intel granted him over two months of medical leave. There is no evidence that Intel even regarded Plaintiff as precluded from performing any aspects of his old job after he returned from medical leave with no restrictions. The record does not sustain Plaintiff's burden on summary judgment.[1]

### Count II - Disability Discrimination under the NMHRA

Defendant also contends that Plaintiff cannot establish a *prima facie* case of disability discrimination under the New Mexico Human Rights Act. Under the NMHRA, an employer may not discriminate against or discharge an otherwise qualified individual because of a physical or mental handicap or serious medical condition. N.M. Stat. Ann. 1978 § 28-1-7(J) (Repl. Pamp. 1996). The NMHRA defines a physical or mental handicap as an "impairment that substantially limits one or more of an individual's major

---

[1] Because I determine as a matter of law that Plaintiff was neither disabled nor regarded as disabled, and that he did not have a record of disability, I do not reach Intel's other contentions that he was unable to perform the essential functions of his job and that he failed to ask for a reasonable accommodation for his disabilities, except to say that I am not persuaded by either contention.

life activities." Id. § 28-1-2(M).  Working is listed as one of the enumerated major life activities.  Id., § 28-1-2(N).  The Act does not define serious medical condition.

Plaintiff argues that the intent of state law is to afford broader coverage for persons with any serious medical condition, whether or not it substantially limits them in a major life activity, because the NMHRA contains the additional term "serious medical condition" which is neither included in the ADA nor defined in the NMHRA.  I disagree. My review of the few New Mexico cases construing the disability portion of the NMHRA does not reveal such an expansive view of the Act.  *See* Kitchell v. Public Serv. Co. of New Mexico, 126 N.M. 525, 972 P.2d 344 (1998); Martinez v. Yellow Freight System, Inc., 113 N.M. 366,  826 P.2d 962 (1992); Stock v. Grantham, 125 N.M. 564, 572, 964 P.2d 125, 133 (Ct. App.), *cert. denied,* 125 N.M. 322, 961 P.2d 167 (1998). Therefore, Intel is entitled to summary judgment on Plaintiff's NMHRA claim for the reasons discussed above under the ADA.

### Count IV - Retaliation

While Plaintiff has abandoned his gender discrimination claim under Title VII, and his disability discrimination claims will be dismissed, he continues to assert that he was terminated in retaliation for his complaints of gender and disability discrimination. Title VII prohibits an employer from discriminating against an employee in retaliation for opposing unlawful employment practices.  42 U.S.C. § 2000e-3(a).  The ADA and the NMHRA also prohibit retaliation for engaging in protected activity.  42 U.S.C. § 12203(a); N.M. Stat. Ann. 1978 § 28-1-7(I)(2).  A plaintiff may bring a retaliation

14

claim despite being unsuccessful in the original charge of discrimination. *See* <u>Archuleta v. Colorado Dept. of Insts.</u>, 936 F.2d 483, 487 (10th Cir. 1991) (sex discrimination); <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 502 (3d Cir. 1997) (disability discrimination).

The elements of a *prima facie* case of retaliation under Title VII are: (1) the employee engaged in protected activity; (2) the employer subjected the employee to adverse employment action; and (3) a causal connection existed between the two actions. <u>Bullington v. United Air Lines, Inc.</u>, ___ F.3d. ___, 1999 WL 606880 at *12 (10th Cir. 1999). Retaliation claims are treated the same whether brought under Title VII or the ADA. <u>Penny v. United Parcel Serv.</u>, 128 F.3d 408, 417 (6th Cir. 1997).

It is undisputed that after receiving the CAP, Plaintiff complained about gender discrimination by his supervisor, Jamie Robillard, to two Intel Human Resources representatives, Roger Rodriguez and Len DeLlano. As for disability discrimination, although the evidence is less clear, it is sufficient to meet the first element of Plaintiff's *prima facie* case. Plaintiff alleges that he told DeLlano that Robillard "failed to consider his medical condition as a mitigating factor in his absences from work." Aff. VanderHeyden ¶ 39 at 8. He also complained to DeLlano that Robillard was insensitive to employees who have psychological problems, and that he expressed concern that his medical condition would be the subject of workplace gossip. *See* Pl. Ex. O. It is undisputed that subsequent to these complaints, Plaintiff was terminated. This is sufficient to establish the first two elements of his *prima facie* case of retaliation.

Intel argues that there is no evidence of a causal connection between his activity and the adverse action, i.e., his termination.  A causal connection can be inferred from protected conduct closely followed by adverse action.  *See* <u>Conner v. Schnuck Markets, Inc.</u>, 121 F.3d 1390, 1395 (10th Cir. 1997) (finding four-month delay between protected activity and termination not sufficiently close in time to infer causation in FLSA case); <u>Burrus v. United Tel. Co. of Kansas, Inc.</u>, 683 F.2d 339, 343 (10th Cir.) (finding no inference of causation when charges of gender discrimination made three years before termination), *cert. denied,* 459 U.S. 1071 (1982).  Here the termination occurred less than two months after Robillard learned of Plaintiff's complaints to DeLlano about discrimination, and it would have occurred even sooner if his medical leave had been shorter.  This is sufficient to infer causation, and I conclude that Plaintiff has established a *prima facie* case of retaliation.

Once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. <u>Berry v. Stevinson Chevrolet</u>, 74 F.3d 980, 986 (10th Cir. 1996).  If the defendant meets this burden, the plaintiff must come forward with evidence that the defendant's offered reasons are pretext, or unworthy of belief.  <u>Id.</u>  A plaintiff may establish pretext "by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"  <u>Bullington</u>, 1999 WL 606880 at *9 (*quoting* <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir.

1997)).  Summary judgment is precluded where Plaintiff establishes a *prima facie* case and sufficient facts exist to allow a reasonable jury to reject the employer's proffered reason for discharge.  Randle v. City of Aurora, 69 F.3d 441, 451-53 (10th Cir. 1995).

The parties agree that Intel has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, i.e., his alleged misrepresentations regarding his jury duty during the week of January 13, 1997.  Thus, the burden shifts to Plaintiff to establish that Intel's reason is pretext.  VanderHeyden contends that if he had not complained about Robillard's treatment of him after he received the CAP, he would not have been fired.  It is undisputed that Intel was aware of the discrimination complaints.  Given that, there is evidence to support an inference of pretext, including (1) Intel may have already suspected when it gave Plaintiff the CAP that he had misrepresented his jury duty, (2) he may not have misrepresented his jury duty, (3) Intel delayed over two months to confront him with the allegations of misrepresentation, (4) the confrontation was brief and not conducive to allowing him to defend himself, and (5) Intel may have exaggerated the allegations of misrepresentation at the time of the confrontation.  I shall examine this evidence in detail.

First, Intel supports the termination by claiming it first learned of the discrepancies between Plaintiff's jury duty and his attendance on January 28, a week after delivering the CAP, when it received paperwork from the metropolitan court showing Plaintiff was paid for only two mornings of jury duty.  However, there is evidence that Robillard suspected him of misrepresenting his jury duty when she presented the CAP on

January 20, and that she had discussed her suspicion with DeLlano.  The CAP that

Robillard delivered to Plaintiff on January 20, 1997, details several incidents of

attendance and performance problems, including several entries for the week of jury duty.

It then contains the following statement:

> James (sic) attendance during his Jury Duty assignment has
> been inappropriate.  *He did not report physically to work*
> *during time that he was not required to be at Jury Duty*.

Aff. VanderHeyden, attachment H at 2 (emphasis added).  DeLlano testified that

Robillard suspected Plaintiff of misrepresenting his jury duty as early as mid-January,

before she prepared his CAP.  Dep. DeLlano at 19-21, 31-41.  It would be inconsistent if

not disingenuous for Intel to fire VanderHeyden for a "newly discovered" reason if it

already suspected or knew of the reason when it delivered his CAP.

Second, the evidence Plaintiff lied about jury duty is disputed.  The times in

question are the afternoons of January 13 and 14, and the entire day of January 16.  When

he was on jury duty, Plaintiff understood that if his presence at court was not required on

any given day, he should act as if that day was a regular work day.

*January 13.*  Plaintiff began his jury duty the morning of the 13th; his jury pool

was dismissed at noon.  Plaintiff met with the jury clerk on the afternoon of that day to

arrange to be excused from jury duty on January 20 and 21, as he had been directed by

Robillard to do because of his job duties, and he did not report to work the rest of the

day.  On the evening of January 13, Plaintiff left Robillard a voice-mail message stating

he was on a jury starting a two-day trial the next day, which was true.  Even if it was

unreasonable for Plaintiff to believe he could simply not show up to work for the rest of the day after morning jury duty, that does not necessarily prove a misrepresentation.

*January 14.* Plaintiff served on jury duty the morning of the 14th, and he was excused that afternoon when the court closed due to a snowstorm. He did not report to work that afternoon even though Intel was not closed, nor did he call his supervisor. Again, this evidence may show an attendance problem but not necessarily a misrepresentation.

*January 16.* On the morning of January 16 Plaintiff left a message for Robillard that he was not on jury duty for the morning session, that he would determine whether his presence was required for jury duty in the afternoon, and that he would report to work by 1:00 p.m. if not required to be at court. He did not serve on jury duty that day, and he reported to work around noon and performed some work. There is a crucial factual dispute about a voice-mail message VanderHeyden left for Robillard that evening. Plaintiff's version is that he simply told Robillard that he would report to work the next day. Robillard's version is that he told her he had been on jury duty all day and would return to work the next day. If Plaintiff's version is believed, the fact finder may conclude that he did not make misrepresentations about his jury duty on the 16th.

If VanderHeyden did not lie about his jury duty but simply failed to report to work when not required to be at jury duty, then his behavior may be no different from the general attendance problems he was exhibiting that had been detailed in the CAP, not grounds to fire him.

Third, Intel maintains that Robillard waited to confront VanderHeyden with the alleged misrepresentations for over two months because she was "prohibited" from contacting him during his medical leave, but this is belied by the fact that Plaintiff was in contact with Human Services representatives Rodriguez and DeLlano during his leave. It would have been easier for Plaintiff to reconstruct the details of the week of his jury duty if Robillard had informed him of her suspicions about misrepresentations sooner than his return to work on March 31.

Fourth, the confrontation on March 31 lasted only a short time. Robillard informed VanderHeyden that court documents showed he was on jury duty for only a total of four and one-half hours on January 13 and 14. She told him he was supposed to report to work when he was not on jury duty, accused him of lying, then suspended him from his job without allowing him a reasonable opportunity to respond. Plaintiff was unable to spontaneously recall his activities or his reports to Robillard that week in January, and he told Robillard that he could not accurately report his time without refreshing his recollection by reference to notes. He did not admit that he had misrepresented his jury duty to Robillard, but noted his medical condition at that time, and the possibility that his recollection was imperfect. Plaintiff was terminated two days later.

Finally, at the time of the confrontation on March 31 there is evidence either that Plaintiff was confused about the days on which he was accused of lying about jury duty, or that his supervisor falsely accused him of lying about jury duty on January 15 and

exaggerated about the 16th.  Intel presently does not accuse him of lying about the 15th.

On that day Plaintiff called the court in the morning and discovered it was closed again

because of a snowstorm, and then called Robillard and was excused for the day to stay

home with his young son whose school was also closed.  *See* Def. Ex. 3 to Reply Brief.

And on the 16th when he was accused of misrepresenting that he was on jury duty all day

and of being absent all day, Intel's own evidence shows that Plaintiff did call in to

Robillard that morning to tell her he was not on jury duty for the morning session, and

that he was seen at work for at least some time in the afternoon.  *See* attachment to

Robillard Dep., Def. Ex. B.

This evidence is sufficient to raise a genuine question of material fact whether the

stated reason for Plaintiff's termination was pretext for retaliation.  Therefore, I will deny

the motion for summary judgment on the retaliation claims.

## Count V - Breach of Contract

Plaintiff claims he had an implied contract of employment with Intel that was

created by policies and procedures.  He claims Intel breached the terms of the implied

employment contract by terminating him without just cause.  Intel contends that

Plaintiff's breach of contract claim must fail because his employment was at-will.  It also

argues that even if there was an implied employment contract, Plaintiff is barred from

recovering for any breach of contract because of his admitted secret tape-recording of

conversations with both Robillard and Rodriguez, which is grounds for immediate

termination under Intel's guidelines.

21

The general rule in New Mexico is that an employment relationship is presumed to be at-will, and either party can terminate it for any reason or no reason without liability. Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993), *cert. denied,* 510 U.S. 1118 (1994).  One exception to this general rule is the existence of an implied contract term that restricts the employer's power to discharge.  Id.  To create an implied contract, "the *promise* that is claimed to have altered the presumed at-will term [must] *be sufficiently explicit* to give rise to reasonable expectations of termination for good cause only."  Id. at 672, 857 P.2d at 783 (emphasis in original).  "The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon."  Id.  New Mexico courts "consider the totality of the parties' relationship, circumstances and objectives in determining whether the presumption of at-will employment has been rebutted."  Id.

Attached to the briefs are the following Intel documents upon which the parties base their contract arguments:  (1) Plaintiff's employment application, dated August 12, 1994; (2)  Plaintiff's Employee Agreement dated September 2, 1994; (3) Plaintiff's Employee Orientation Certification, also dated September 2, 1994; and (4) several "Guidelines" which appear to be part of Intel's policy manual:  Equal Employment Opportunity and Diversity Guideline, Def. Ex. 4; Open Door Guideline, Def. Ex. 5; Attendance Guidelines, Def. Ex. 6; and Discipline and Discharge Guidelines, Def. Ex. 7 (not signed) and 9 (signed by VanderHeyden).

The first three documents, all signed by Plaintiff, contain explicit language making

Plaintiff's employment at-will.  The employment application, for example, states:  "no company policies, procedures or handbooks that I might receive are intended to create an employment contract between the company and myself. . . ."  Def. Ex. 3.  The employee agreement states:  "This Agreement . . . does not in any way restrict my right or the right of INTEL to terminate my employment at will . . . ."  Def. Ex. 10.  The employee orientation certification states:  "I have the right to terminate my employment at any time and . . . Intel retains a similar right.  In addition, . . . my employment will continue as long as Intel in its sole judgment determines that my services are required."  Def. Ex. 11.

Countering these explicit disclaimers is language, most notably in the discipline and discharge guidelines, that arguably gives rise to expectations on the part of exempt employees that attendance and other performance problems will not result in immediate termination.  For example, lying, misrepresentation, and falsifying work records are all listed as grounds for "immediate termination," whereas attendance and other performance problems are listed as the types of problems that "result in disciplinary action; however, they do not normally warrant termination after the first occurrence.  Progressive discipline means an oral and/or written notice of a performance problem, and the opportunity to correct the problem. . . .  Any form of progressive discipline at Intel's sole discretion may be used to correct performance problems. . . .  Note:  Corrective Action Plans are **not** required for grades 10 or higher."  Def. Ex. 7 (emphasis in original).  Reinforcing the notion that Intel has committed itself to dealing with attendance and performance problems by using progressive discipline is this language in the attendance

guidelines for exempt employees: "Exempt employees who do not follow these guidelines or whose work is not performed according to expectations will be subject to disciplinary measures including a Corrective Action Plan." Def. Ex. 6.

Intel tells its employees that the policy manual is not part of the employment contract and that their jobs are terminable at will, negating a reasonable expectation that it must conform to the procedures it outlines. *But see* Garcia v. Middle Rio Grande Conservancy Dist., 121 N.M. 728, 731-32, 918 P.2d 7, 10-11 (1996) (finding personnel policy formed part of implied employment contract); Lukoski v. Sandia Indian Mgmt. Co, 106 N.M. 664, 666-67, 748 P.2d 507, 509-10 (1988) (finding employee handbook impliedly modified employment relationship). After carefully considering these documents, and in the absence of any countervailing witness testimony about Intel's customs and practices, I conclude that Plaintiff has not overcome the presumption that he was an at-will employee.

Plaintiff argues, however, that even if he was an at-will employee, Intel can be liable for breaching the implied covenant of good faith and fair dealing that inheres in all contracts. This argument is contrary to New Mexico law, which declines to recognize a cause of action in an at-will contract for breach of the implied covenant of good faith and fair dealing. Bourgeous v. Horizon Healthcare Corp., 117 N.M. 434, 438, 872 P.2d 852, 856 (1994); Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 730, 749 P.2d 1105, 1109 (1988), *cert. denied,* 488 U.S. 822 (1988). Therefore, I will grant summary judgment on Plaintiff's breach of implied employment claim, including the implied

covenant claim.[2]

**Count VI - Retaliatory Discharge**

New Mexico recognizes a cause of action for retaliatory discharge of an at-will employee who has been terminated for reasons that contravene public policy. Shovelin v. Central New Mexico Elec. Coop., Inc., 115 N.M. 293, 303, 850 P.2d 996, 1006 (1993). Retaliatory discharge is a "narrow exception to the rule that an at-will employee may be discharged with or without cause." Id.

> The lynchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy.'

Id. An employer's motive for termination is a "key element of retaliatory discharge." Lihosit v. I & W, Inc., 121 N.M. 455, 458, 913 P.2d 262, 265 (Ct. App.), *cert. denied,* 121 N.M. 444 (1996).

A New Mexico statute prohibits an employer from "depriv[ing] an employee of his employment . . . because the employee receives a summons, responds thereto, serves as a juror or attends court for prospective jury service." N.M. Stat. Ann. 1978 § 38-5-18 (Repl. Pam. 1998). I conclude that in New Mexico terminating an employee for serving as a juror or for attending court for prospective jury service would violate a clear mandate of public policy and give rise to a cause of action for retaliatory discharge. *See* Nees v.

---

[2] Because I grant summary judgment on Plaintiff's breach of contract claim, I do not reach Intel's alternative argument that the contract claim must fail because of after-acquired evidence that he secretly tape recorded two conversations with other Intel employees.

Hocks, 536 P.2d 512, 515-16 (Or. 1975) (*en banc*) (recognizing liability of employer for discharging employee for going on jury duty); *see also* Wiskotoni v. Michigan Nat'l Bank-West, 716 F.2d 378, 382-83 (6th Cir. 1983) (recognizing tort of wrongful discharge under Michigan law where employee fired for testifying before grand jury).

Intel contends there is no evidence to support Plaintiff's claim that he was terminated because he served on jury duty. It argues that Plaintiff was never told not to report to jury duty or that his job would be jeopardized if he attended jury duty, and that he was allowed to attend jury duty. Intel invokes the truism that public policy is not violated by an employer who discharges an employee for lying about jury duty. Intel reasons that if it had intended to terminate Plaintiff merely for serving on jury duty, it would have terminated him in January 1997 and not in April after discovering that he had lied about his jury duty.

Plaintiff denies that he lied about his jury duty and, as discussed above in the section on Count IV (retaliation), I have concluded that there are genuine questions of fact as to whether Plaintiff lied about his jury duty on the dates in question. As evidence of an anti-jury duty bias, Plaintiff alleges that Robillard made him delay his jury duty twice in 1996, and when he finally began to serve on January 13, she demanded he be excused for two days in the following week. Also, although he was allowed to serve his jury duty, he contends he was expected to keep up with his own work because his supervisor provided no coverage for his duties while he was gone.

VanderHeyden clearly had attendance problems during his week of interrupted

jury duty (most notably the afternoons of January 13 and 14, and part of the day of January 16), and he performed poorly when he returned to work on the 16th and 17th. But he was not fired for attendance and performance problems, only for allegedly lying about his jury service. If he did not lie about it, then his termination may have violated the statute. If an employee is accused of lying about jury duty, it is important as a matter of public policy that the employer ensure the accusation is accurate. The circumstances of VanderHeyden's termination indicate that Intel may not have been as concerned about the truth as it was about getting rid of VanderHeyden. To wait over two months and then demand an immediate accounting may have been unfair under the circumstances. The factfinder must resolve the question of the employer's true motive in discharging Plaintiff. A jury could reasonably find based upon the evidence of record that Plaintiff was deprived of his employment because he served as a juror or because he attended court for prospective jury service.

NOW, THEREFORE, IT IS ORDERED that Defendant's Motion For Summary Judgment is hereby GRANTED IN PART on Counts I, II and V, and DENIED IN PART. Count III has been withdrawn by Plaintiff. Counts I, II, III and V are hereby dismissed; Counts IV (retaliation) and VI (retaliatory discharge) remain for trial;

IT IS FURTHER ORDERED that Defendant's First Motion in Limine is hereby GRANTED;

IT IS FURTHER ORDERED that Defendant's Motion To Partially Strike the

Affidavit of James VanderHeyden is hereby GRANTED.

_____
SENIOR UNITED STATES DISTRICT JUDGE


Counsel for Plaintiff:  E. Justin Pennington, Albuquerque, N.M.

Counsel for Defendant:  Duane C. Gilkey and Barbara G. Stephenson, GILKEY, STEPHENSON & WEESE, Albuquerque, N.M.